O 106 (Rev. 04/10 Application for a Search Warrant)

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

JAN - 3 2018

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

**Information associated with the cellular telephone assigned call number (862) 600-2950 that is stored at premises controlled by T-Mobile**

Case No. 2:18sw 2

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)* **Information associated with the cellular telephone assigned call number (862) 600-2950 that is stored at premises controlled by T-Mobile**

located in the District of New Jersey, there is now concealed *(identify the person or describe the property to be seized):*

**See Attachment A.** This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711 (3)(A).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section(s) | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Attempt and conspiracy to commit a controlled substance abuse |
| 18 U.S.C. § 371 | Conspiracy to commit any offense against the United States |
| 21 U.S.C. § 841(a)(1) | Manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance |
| 21 U.S.C. § 841(a)(1) | Distribution of controlled substance resulting in serious bodily injury or death |

The application is based on these facts: **See Affidavit.**

☒ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

READ AND APPROVED:

_____
*Applicant's signature*

Kevin Corcoran, Special Agent, DEA
*Printed name and title*

Daniel T. Young
Assistant United States Attorney

Sworn to before me and signed in my presence.

Date: 1-3-18

City and state: Norfolk, VA

_____
*Judge's signature*

Lawrence R. Leonard
United States Magistrate Judge
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

1. This warrant applies to records and information associated with the cellular telephone assigned call number (862) 600-2950 (the "SUBJECT TELEPHONE NUMBER"), whose wireless service provider is T-Mobile ("the Provider"), a company headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

2. Information about the location of the SUBJECT TELEPHONE NUMBER that is within the possession, custody, or control of T-Mobile.

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.    Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **March 1, 2016, through December 31, 2016**:

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        ii. information regarding the cell towers and sectors through which the communications were sent and received.

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence or demonstrates the instrumentalities of violations of

- Title 21, United States Code, Section 846;
- Title 18, United States Code, Section 371; and
- Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), and (b)(1)(C)

involving Kenneth Stuart during the period **March 1, 2016, through December 31, 2016.**

LRL
kc

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

JAN - 3 2018

*Norfolk Division*

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | ) ) ) |
| Information associated with the cellular telephone assigned call number (862) 600-2950 that is stored at premises controlled by T-Mobile | ) Case No. 2:18sw 2 ) ) ) ) |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Kevin Corcoran, being first duly sworn, state:

### Introduction and Agent Background

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (862) 600-2950 ("the SUBJECT PHONE"), that is stored at premises controlled by T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I have been employed by the DEA since November 2003, and I am currently assigned to the High Intensity Drug Trafficking (HIDTA) Task Force. As a federal law enforcement officer, I have specialized training and experience in money laundering and narcotics smuggling and distribution investigations, including 16 weeks of narcotics investigative training at the DEA academy in Quantico, Virginia. During my employment with DEA, I have participated in many investigations into the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as related laundering of monetary instruments. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers.

3. Prior to my duties with the DEA, I was employed as a law enforcement officer in Virginia Beach, Virginia, for six years. From 2001 through 2003, I worked as an undercover detective, and I participated in numerous narcotic investigations involving the illegal manufacturing, possession, sale, distribution and importation of a variety of controlled



substances. I have worked with numerous informants in the investigation of controlled substances.

4. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

5. The statements in this affidavit are based in part on my investigation of this matter and on information provided by other law enforcement agents. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

## Pertinent Federal Criminal Statutes

6. On August 23, 2017, a Grand Jury sitting in Norfolk, Virginia returned a Second Superseding Indictment charging Kenneth STUART with fourteen counts relating to a conspiracy to distribute heroin, fentanyl, and furanyl fentanyl in Hampton Roads.[1]

7. The Second Superseding Indictment charges Mr. Stuart with violating the following criminal statutes:

    a. Title 21, United States Code, Section 846, which makes it unlawful to attempt or conspire to commit any offense that violates a federal drug law (Count 1);

    b. Title 18, United States Code, Section 371, which makes it unlawful to conspire "to commit any offense against the United States" (Count 2);

    c. Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), which in part make it unlawful to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance (Counts 3–9);

    d. Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), which in part specify certain enhanced statutory penalties for distribution of controlled substances resulting in serious bodily injury or death (Counts 10–14).

8. Based on the facts set forth in this affidavit, there is probable cause to believe that Kenneth STUART has violated these statutes. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

---

[1] *See* Second Superseding Indictment, *United States v. Stuart*, No. 2:17-cr-61 (E.D. Va. Aug. 23, 2017), ECF No. 103.

## Probable Cause

9. Kenneth STUART was the out-of-state (New Jersey) source of supply of heroin and fentanyl for a local drug trafficking operation led by Erskine Dawson, Jr. STUART supplied Dawson with narcotics that led to at least ten overdoses, two of which were fatal, and continued to do so even after learning of the deaths.

10. In or about March 2016, STUART was introduced to Dawson in Virginia. Throughout the conspiracy, STUART delivered doses of a substance containing both heroin and fentanyl. STUART'S product was packaged in wax baggies and marketed with labels like "King of Death" and "Last Call."

11. According to multiple co-conspirators, STUART concealed narcotics in stuffed animals and personally transported them by commercial bus from New York to the Hampton Roads area where Dawson and his dealers made retail distributions.

12. Eventually, STUART directed others, including former co-defendant Carolyn Freeman, to bring drugs on his behalf to Virginia.

13. In August of 2016, STUART was incarcerated temporarily for a probation violation, but he was able to communicate with his co-conspirator, Rashad Clark, who managed to continue the flow of heroin and fentanyl to Hampton Roads. Clark personally brought at least 5,000 bags of the heroin/fentanyl mix to Dawson while STUART was in custody. Clark continued to work with Freeman and others to assist in the trafficking of narcotics from New Jersey.

14. As part of the conspiracy, Dawson directed his associates to make bank deposits into a Wells Fargo account linked to Rashad Clark. From in or about September 2016 to in or about December 2016, Wells Fargo banking records indicate that Dawson and others associated with the conspiracy deposited over $75,000 in cash into the account.

15. The conspiracy was responsible for numerous overdoses and fatalities resulting from opioid use.

   a. The first known non-fatal overdose from narcotics supplied by the conspiracy, which required medical intervention, occurred on July 31, 2016.

   b. The second known non-fatal overdose associated with these drugs was on August 27; in that case, the victim required the administration of Narcan by emergency medical personnel to survive.

   c. On September 1, 2016, a man staying at the Studios 4 Less in Virginia Beach overdosed on narcotics purchased from the Dawson. He was revived by medical personnel. Later that same day, his wife also overdosed in the same room on the same batch of drugs used by her husband. She too was rescued by emergency medical personnel, who administered Narcan. Her young children, who were living at the Studios



     4 Less with them, found her unconscious in the bathroom, and had to knock on a neighbor's door to get help.

  d.  A week later, H.D. obtained fentanyl from the defendant. One of the defendant's runners, Thomas Jennings, was with her when she was overdosing and tried to revive her. Jennings left before medical personnel arrived, and H.D. was subsequently pronounced dead.

  e.  A month later, on October 31, 2016, a man and a woman using the defendant's drugs overdosed simultaneously with children present. Emergency medical personnel were contacted, administered Narcan, and saved them.

  f.  Two weeks later, on November 14, 2016, two of Dawson's runners delivered heroin to G.M., who overdosed and died.

16.  Dawson spoke to STUART, who had been released from state custody on November 9, to discuss G.M.'s death. STUART instructed the defendant to continue selling the rest of the batch. They agreed to then start selling a different "brand," featuring a different mix of heroin and fentanyl, not out of concern that they were killing people, but so that they would not attract the attention of law enforcement.

17.  On November 17 and December 1, 2016, Dawson sold heroin and fentanyl to two different confidential informants. On December 8, 2016, police officers from Virginia Beach and Chesapeake executed search warrants at the Studios 4 Less location in Virginia Beach and arrested the defendant. They recovered nearly 2,000 baggies of the heroin and fentanyl mix, many of which were labeled "King of Death."

18.  One of the phones recovered from Studios & Suites 4 Less in Virginia Beach was a Black Samsung phone, model SM-G550T1, found in Room 252. Officers with the Virginia Beach Police Department later obtained a state search warrant to examine the contents of the phone. In the phone's list of contacts are "Bones New" and "New Bones." The number associated with both names is that of the SUBJECT PHONE, 862-600-2950. "Bones" is a known alias of STUART.

19.  Also on December 8, 2016, officers with the Chesapeake Police Department executed a search warrant at the Ramada Inn on Military Highway in Norfolk. There, they spoke with Carolyn Freeman. While speaking with Freeman, one of the detectives noticed that her cell phone was ringing. When he looked at the phone, he saw that someone appearing in Freeman's list of contacts as "King" had called multiple times. The detective took a photograph of the cell phone's screen showing the name "King" and the associated number. That number is the same as the number for the SUBJECT PHONE—(862) 600-2950.

20.  Agents working with the DEA obtained consent from one of STUART'S unindicted co-conspirators ("UC-1") to download the contents of UC-1's two cell phones. These phones contain numerous text messages between UC-1 and the SUBJECT PHONE regarding the sale of narcotics:

  a.  On May 25, 2016, UC-1 and the SUBJECT PHONE exchanged text messages about the owner of the SUBJECT PHONE travelling to Norfolk.

       In one message, UC-1 texts, "You'll be in Norfolk by 2." The SUBJECT PHONE later responded, "I'm here."

    b.    On June 5, 2016, the SUBJECT PHONE texted the following message to UC-1: "You know we owed Roddy for those two bricks he sent down with qua." Rashad Clark, one of the co-conspirators in this case admits that Roddy is a name with which he is commonly known. Based on my training and experience, the term "bricks" is commonly used to describe a wholesale quantity of narcotics.

    c.    On June 13, 2016, the SUBJECT PHONE texted address information for Carolyn Freeman to UC-1. UC-1 then texted back a confirmation number for a transfer of funds, 72684069.

    d.    On June 18, 2016, the SUBJECT PHONE texted UC-1: "New stamps .. Chef Curry and Summer 16." The SUBJECT PHONE later texted: "Go ahead and promote them." At least one customer of Dawson has confirmed to law enforcement that "Chef Curry" was a brand name of heroin sold by Dawson and his co-conspirators.

    e.    On November 21, 2016, the SUBJECT PHONE texted UC-1: "I'm at the Ramada 159." Records from the Ramada Inn on Military Highway in Norfolk show that, on that date, Room 159 was registered to Thomas Jennings, one of Dawson's drug runners.

21.    Further investigation conducted by agents resulted in the discovery of information displayed through social media. STUART, also known as "Maurice Beale," revealed he was an active member of Facebook and was listed as "friends" with two other co-conspirators in this case.

22.    Several other defendants who participated in this conspiracy have pleaded guilty and/or been sentenced, as summarized by the chart below:

| Defendant | Case | Pleaded Guilty | Sentence |
| --- | --- | --- | --- |
| Thomas E. Jennings | No. 2:17-cr-61 | June 9, 2017 | 180 months (ECF No. 135) |
| David Thomas | No 2:17-cr-92 | June 22, 2017 | 51 months (ECF No. 19) |
| Erskine Dawson, Jr. | No. 2:17-cr-61 | July 18, 2017 | 432 months (ECF No. 170) |
| Christopher L. Boone | No. 2:17-cr-61 | Aug. 17, 2017 | 186 months (ECF No. 190) |
| Frank Harris | No. 2:17-cr-61 | Sept. 19, 2017 | To be determined |
| Rashad L. Clark | No. 2:17-cr-61 | Dec. 7, 2017 | To be determined |
| Carolyn Freeman | No. 2:17-cr-61 | Dec. 19, 2017 | To be determined |



## Specifics of Search and Seizure of Historical Cell Site Data

23. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

24. Based on my training and experience, I know that T-Mobile can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

25. In this case, T-Mobile has responded to various requests for information relating to the SUBJECT PHONE, including administrative subpoenas for historical call data, or "toll records." An agent working with DEA has also confirmed that T-Mobile currently possesses the information that is identified in Attachment B.I relating to the SUBJECT PHONE.

26. Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators.

## Conclusion

27. Based on the foregoing, I believe there is probable cause that evidence of criminal activity on the part of STUART will be present in the information requested in Attachment B. More particularly, this information will demonstrate STUART'S travel between New Jersey and Virginia in support of the conspiracy to distribute heroin, fentanyl, and furanyl fentanyl described above.

6

28.    I therefore request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

29.    I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

FURTHER AFFIANT SAYETH NOT.

Kevin Corcoran, Special Agent
Drug Enforcement Administration,
United States Department of Justice

SUBSCRIBED and SWORN before me on this 3rd of January 2018 at Norfolk, Virginia.

UNITED STATES MAGISTRATE JUDGE

7